NO. 07-04-0597-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL B



FEBRUARY 27, 2006


______________________________



In the MATTER of the MARRIAGE of BENITA HIGGINS 


and JOHNNY L. HIGGINS 
 

_________________________________



FROM THE 108TH DISTRICT COURT OF POTTER COUNTY;



NO. 67,809-E; HON. ABE LOPEZ, PRESIDING


_______________________________



On Motion for Rehearing


_______________________________



Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

 Pending before the court is the motion of Johnny L. Higgins for rehearing. He raised
two issues in it. We review only the second. It concerns the unequal division of the
community estate, what constituted the community estate, and our purported error in
concluding that the trial court found Benita Higgins' retirement account to be her separate
property. We overrule the contention.

 As noted in our original opinion, the trial court found that "the individual retirement
account in the wife's name [was] her separate property." So too did it hold that "[a]ll the
property belongs to the community estate except for the following properties, which belong
[to] BENITA HIGGINS'[] separate estate . . . [t]he individual retirement account in the wife's
name." Yet, Benita conceded, in response to the motion for rehearing, that she owned both
an individual retirement account and a 401(k) retirement plan, that the individual retirement
account had a value approximating $21,774 while the 401(k) plan was valued at $182,456,
and that in alluding to the "individual retirement account," the trial court actually meant the
account valued at $21,774. So, both litigants now represent that the trial court actually held
the former and not the latter retirement interest to be Benita's separate property. Assuming
this to be true, we find no need to change our prior judgment. (1) This is so because we again
cannot say that the trial court abused its discretion in the way it divided the community
estate.

 Johnny admitted in his appellant's brief that a trial court may order an unequal
division of the community estate under certain circumstances. So too did he admit that one
such circumstance involved fault in causing the dissolution of the marriage. See Massey
v. Massey, 807 S.W.2d 391, 398 (Tex. App.-Houston [1st Dist.] 1991, writ denied) (holding
that fault may be considered by the trial court in deciding how to divide the community
estate). He also acknowledged that one of the factors, i.e. fault, "favored Benita." Indeed,
the record contains a plethora of evidence illustrating that during his marriage to Benita,
Johnny conducted an affair with another woman and both lied to and belittled Benita when
she inquired into it. And, only through her investigative efforts and DNA analysis did she
confirm her suspicion. Thus, basis appears of record justifying an unequal distribution of
the community estate. And, while he asserts that the division selected was too unequal,
he neither argues nor cites us to authority establishing that infidelity can only justify a
particular percentage of inequality. 

 Given the evidence of fault, we cannot say that the trial court's decision fell outside
the scope of its considered discretion. See In re Marriage of Scott, 117 S.W.3d 580, 584
(Tex. App.-Amarillo 2003, no pet.) (holding that the manner in which a trial court divides
the marital estate lies within that court's discretion). Accordingly, the motion for rehearing
is overruled.


 Per Curiam 
1. We assume this to be true given the representations of all the litigants but note that the evidence
does not necessarily illustrate this. For instance, if the individual retirement account was that account worth
$21,774, as the litigants suggest, then logically it should not have more than $21,774 worth of deposits in it. 
Yet, when testifying about her retirement interests, Benita stated that as a result of a stock purchase, she
initially "received about 100,000, maybe a little bit over that, and that went right into my IRA." (Emphasis
added). Thereafter, the stock purchasers "made the final payment of about 29,000, and . . . I have continued
to contribute to that, so the total includes my contributions." (Emphasis added). Given that the term "IRA" is
but an acronym for the words "individual retirement account," that Benita testified that she deposited over
$129,000 in what she described as her "IRA," that only one retirement account or plan was valued in excess
of $129,000, and the trial court declared her "individual retirement account" to be separate property, the trial
court may well have intended that the account valued at $183,000 was the one he actually intended to find
as her separate property. 



vision, and Brownlee. As illustrated by the latter, conclusion or
opinions without factual support fall short of being evidence. See Brownlee v. Brownlee,
supra (stating that the proffer of a conclusion without factual support was not enough to
stave off a directed verdict). With that said, we turn to the record before us.

 Application of the Foregoing Standard

 As previously mentioned, Lambert complained of acts allegedly performed by
Wilson while being intubated for purposes of administering anesthesia. These acts
purportedly resulted in Lambert suffering a torn esophagus. Furthermore, the standards
of care appearing in the record obligated Wilson 1) "to put the endotracheal tube in the
trachea . . . [it] does not necessarily require you to recognize which wrong spot you've got
it in or whether it's somewhere else . . . [but] requires you to recognize that it is or is not in
the trachea," 2) "[e]stablish and maintain control of the patient's airway during general
anesthesia," 3) "[e]stablish this control in a safe manner," 4) "[p]romptly recognize and
document injuries and complications related to airway management," and 5) "[p]romptly
seek appropriate treatment, if needed, for such injuries and complications." Wilson
allegedly breached one or more of these standards when she 1) "[f]ailed to establish
control of the airway in a safe manner," 2) "[f]ailed to recognize and document injuries and
complications related to airway management," 3) "[f]ailed to seek appropriate treatment for
such injuries and complications," 4) "push[ed] the 7.5 endotracheal tube down into the
esophagus," 5) "plac[ed] the tube," and 6) perforated Lambert's esophagus. Implicit in all
this discussion about standards of care, their breach, and Lambert's suffering of a torn
esophagus is the entry of the tube into Lambert's esophagus. In other words, for her to
recover, Lambert must present more than a scintilla of evidence showing that Wilson
inserted a tube into Lambert's esophagus. If she cannot, then Wilson breached none of
the standards of care propounded or caused Lambert to suffer the injury underlying her
claim, i.e. a torn esophagus. And, therein lies the problem for no such evidence appears
of record.

 Admittedly, Wilson acknowledged that she could not discount the "possibility" that
she placed the 7.5 mm tube into Lambert's esophagus. Yet, as we said in Archer, "opinion
evidence must be based upon more than possibilities . . . ." Archer v. Warren, 118 S.W.3d
at 782 (emphasis added). So, what Wilson described as a possibility is of no import. 

 So too do we recognize that Lambert's expert also addressed whether the tube
entered her esophagus. Moreover, he opined, based on reasonable medical probabilities
that it did. Yet, in explaining why he so concluded, he relied upon Wilson's statement
(appearing in her medical report) that she encountered a "tight fit" when attempting to pass
Lambert's vocal cords. In explaining what he considered to be the source of the "tight fit,"
the doctor stated that "[i]t is my belief that it was the cricopharyngeal ring of the esophagus"
and that "[m]y belief is that the tube was in that portion of the esophagus . . . when it
became too tight." (Emphasis added). Upon what evidence or facts, if any, he founded
these beliefs went unmentioned, however. Nor did he cite to anything in the medical
records to support his belief. In other words, his "belief" was simply that, his "belief," and
lacking factual explanation, it was conclusory and constituted no summary judgment
evidence. This particular expert also wrote in his report that "the fact . . . the first
endotracheal tube was too large suggests that it would deflect from the vocal cords and
enter the esophagus" but he did not state that the tube so deflected or describe how the
tube could so deflect from one part of the anatomy into another. Simply put, the expert is
again discussing possibilities. 

 Finally, that the surgeon who remedied the tear may have opined that it occurred
during Wilson's intubation of Lambert is also deficient. It too is nothing more than a
hypothesis without explanation. 

 In sum, the possibility and subjective belief that Wilson inserted an endotracheal
tube into Lambert's esophagus are simply conclusions. As such, they are not evidence
that proves the questioned fact. Consequently, we have no evidence that the tube entered
the esophagus, which, in turn, means that Lambert failed to present more than a scintilla
of evidence that Wilson breached any purported standard of care.

 Accordingly, we overrule appellant's issues and affirm the summary judgment.


 Brian Quinn

 Chief Justice



1. John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code
Ann. §75.002(a)(1) (Vernon 2005).